# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3266
_____

Ria Schumacher

*Plaintiff - Appellee*

v.

SC Data Center, Inc., doing business as Colony Brands, Inc.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City
_____

Submitted: April 27, 2022
Filed: May 3, 2022
_____

Before KELLY, ERICKSON, and GRASZ, Circuit Judges.
_____

ERICKSON, Circuit Judge.

In February 2016, Ria Schumacher commenced this purported class action, alleging SC Data Center, Inc. ("SC Data") committed three violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x. In May 2016, the parties reached a tentative settlement agreement. Four days later, the Supreme Court decided Spokeo, Inc. v. Robins, 578 U.S. 330 (2016), which led SC Data to move to dismiss this action for lack of standing. Without deciding standing, the district court

approved the settlement. This Court vacated the district court's approval of the settlement agreement and remanded for a determination on whether Schumacher has standing to pursue her claims. Schumacher v. SC Data Center, Inc., 912 F.3d 1104, 1105 (8th Cir. 2019). On remand, the district court determined that Schumacher has standing as to all three claims. SC Data again appeals. Because Schumacher lacks Article III standing to bring her FCRA claims, we vacate the district court's orders and remand to the district court with directions that the case be remanded to the state court. See 28 U.S.C. § 1447(c).

## I.    BACKGROUND

In August 2015, Schumacher applied for employment with SC Data. As part of the application process, she responded "no" to a question asking whether she had ever been convicted of a felony. She added the following handwritten explanation: "was once arrested in 1996 at age 17 and then found Not guilty."[1] Schumacher signed a certification on the form attesting that the answers she provided to the questions were true and correct and further authorized SC Data to contact, among other entities, references, past or present employers, law enforcement agencies, and "any other sources of information which may be relevant to [her] application for employment." SC Data reviewed Schumacher's application and called her to let her know that it would send her links to complete pre-employment tests. After Schumacher completed the tests, she was offered a position to begin on October 21, 2015. SC Data sent Schumacher an orientation email and asked her to complete an Authorization for Release of Information ("Authorization") form.

The Authorization notified Schumacher that SC Data intended to use Sterling Infosystems "to conduct a criminal background search." It further stated that a "search will only be conducted once an offer of employment has been made."

---

[1] According to public records and a book authored by Schumacher, in the late 1990s, Schumacher, among others, was implicated in a murder case involving a drug deal. Although only 17 years old, she was tried as an adult, convicted, and sentenced to a term of 25 years in state prison. She was released after serving 12 years.

Schumacher was directed to read the form because it contained information pertaining to the FCRA and her rights under the Act. The Authorization contained five paragraphs of information, including:

- A statement advising Schumacher that the company may refuse or terminate employment if she provides false or misleading information on her application or during an interview.
- Authorization for Sterling Infosystems and its representatives "to make an independent investigation of [her] criminal records maintained by public and private organizations." The form also contained an additional statement applicable to those applying for motor carrier positions.
- A statement that Schumacher would be provided with a copy of the report and a written description of her rights under the FCRA prior to the denial of an assignment, extension, reassignment, or promotion.
- A statement informing Schumacher that if she "disagree[d] with the accuracy of any of the information in the report" then she had five days from receipt of the report to notify the company. Upon a challenge to information in the report, the company advised Schumacher that it would not make a final decision until after she had "a reasonable opportunity to address the information contained in the report."
- A release of liability from any claims or lawsuits regarding the information obtained to verify her background, as well as authorization and a release of liability if the company, upon request, submits information regarding her employment to government agencies or private organizations.

SC Data requested, and Sterling Infosystems prepared, a "Background Screening Report" on Schumacher. After SC Data reviewed the report and one week before Schumacher was scheduled to start, SC Data called Schumacher and informed her that it was withdrawing the conditional offer of employment and that a

confirmation letter would follow. Schumacher was afforded neither an opportunity to correct nor to explain the results in the report before the employment offer was withdrawn. Schumacher received a letter two weeks later—one week after her start date had passed. The letter stated: "The report received as a result of [the background] check contains information which, if accurate, would prevent us from offering you employment at this time." The letter went on to state: "If your intent is to dispute the Criminal Background Report, it is required you inform us within seven (7) days from receipt of this letter. A final hiring decision will not be made until after you have had a reasonable opportunity to address the information contained in the report." Enclosed with the letter was the report and a description of her rights available under the FCRA.

The background report Sterling Infosystems provided to SC Data consisted of the following components: county criminal records, an enhanced nationwide criminal search with national sex offender, locator-county validator, and a national sex offender search. The report stated that a Social Security trace/address locator search was completed "to locate jurisdiction for purposes of expanding the scope of the criminal background check." It specifically explained that the applicant's Social Security number was not checked against Social Security Administration records. The database searches uncovered Schumacher's 1996 felony convictions for murder and armed robbery. Handwritten at the top of the report was "offer rescinded - did not disclose felony  K.H." Schumacher has never disputed the accuracy of the information. Instead, her claim is premised on a right to contextualize and explain negative information in her report.

Schumacher, individually and on behalf of others, commenced this action alleging SC Data committed three violations of the FCRA: (1) taking adverse employment action based on a consumer report without first providing the report to the applicant, in violation of 15 U.S.C. § 1681b(b)(3)(A) ("adverse action claim"); (2) obtaining a consumer report without providing a disclosure form that complied with the FCRA, in violation of 15 U.S.C. § 1681b(b)(2)(A)(i) ("improper disclosure claim"); and (3) exceeding the scope of the Authorization by obtaining more

-4-

information than disclosed in the Authorization, in violation of 15 U.S.C. § 1681b(b)(2)(A)(ii) ("failure to authorize claim").

SC Data moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) and 12(h)(3) for lack of standing. The district court construed the motion as a factual attack on jurisdiction. The court initially denied the motion as to the adverse action claim and granted it as to the two remaining counts. On reconsideration, the district court discovered that it overlooked evidence in the record regarding Schumacher's failure to authorize claim and reinstated count three. It also reinstated count two after re-evaluating the evidence and the law, reasoning that SC Data's failure to provide a clear disclosure regarding the type of consumer report it was procuring amounted to a *de facto* injury-in-fact resulting in harm that was not only akin to a common law claim of invasion of privacy but also claims based on misrepresentation and contract. SC Data appeals, contending Schumacher lacks standing to pursue any of her FCRA claims.

## II.    ANALYSIS

It is well-established that a party invoking federal jurisdiction must establish three elements to meet the "irreducible constitutional minimum" of standing: (1) facts demonstrating "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338 (citations omitted). The Supreme Court has construed injury in fact as meaning "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992)). Concreteness is determined by assessing "whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms" such as reputational harm. TransUnion LLC v. Ramirez, 594 U.S. __, 141 S. Ct. 2190, 2200 (2021).

The FCRA has two goals: "to promote 'fair and accurate credit reporting' and to protect consumer privacy." Id. (quoting 15 U.S.C. § 1681(a)). While the FCRA grants a person a statutory right to sue to vindicate violations of the statute, "Article III standing requires a concrete injury even in the context of a statutory violation." Spokeo, 578 U.S. at 341. In another words, "an injury in law is not an injury in fact." TransUnion, 141 S. Ct. at 2205. When courts are examining whether a plaintiff has suffered a concrete harm, it is important to distinguish between those that suffered a physical, monetary, or cognizable intangible harm from those seeking to collect statutorily allowed damages as a way to ensure a defendant's compliance with the law. Id. at 2206. The first group has standing to pursue statutory violations while the latter does not. With these principles in mind, we turn to each of Schumacher's FCRA claims.

## A.    Adverse Action Claim

Schumacher's first count alleges SC Data took an adverse employment action based on her consumer report without first showing her the report. SC Data repeatedly disputes the characterization of the report it obtained, noting it only procured a "limited consumer report" reflecting Schumacher's criminal history. App. Br. at 7. The FCRA defines "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness . . . character, general reputation, personal characteristic, or mode of living . . . collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes." 15 U.S.C. § 1681a(d)(1). SC Data obtained a type of consumer report within the meaning of the statute.

As to employers seeking to gather consumer information, the FCRA provides, in relevant part:

In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person

> intending to take such adverse action shall provide to the consumer to whom the report relates - -
>
>> (i) a copy of the report; and
>>
>> (ii) a description in writing of the rights of the consumer under this subchapter, as presented by the Bureau under section 1681g(c)(3) of this title.

15 U.S.C. § 1681b(b)(3)(A). The undisputed facts establish that Schumacher was offered a job, given a start date, and that the job offer was rescinded before she was given a chance to see or respond to the consumer report. SC Data relied on information in the report when it took adverse employment action. Under the FCRA, Schumacher had an unambiguous right to receive a copy of her consumer report before the adverse action was taken. Nonetheless, there are competing views on whether an employer's failure to comply with the FCRA by providing a copy of the consumer report prior to taking adverse employment action is a bare procedural violation or conduct that causes an intangible harm sufficient to meet minimum Article III requirements for standing.

The debate over what qualifies as an "injury in fact" in the realm of consumer protection laws stems from competing interpretations of the Supreme Court's decision in Spokeo, 578 U.S. 330. While describing Spokeo's instruction as "Delphic," one judge noted the immense amount of ink that has been spilled trying to decipher the difference between intangible harm sufficient for Article III standing and "a bare procedural violation." Thornley v. Clearview AI, Inc., 984 F.3d 1241, 1250 (7th Cir. 2021) (Hamilton, J., concurring). Given the rather amorphous guidance, courts have reached different results.

On the one side, the Third Circuit has concluded that "taking an adverse employment action without providing the required consumer report is 'the very harm that Congress sought to prevent, arising from prototypical conduct proscribed' by the FCRA." Long v. Southeastern Penn. Transp. Auth., 903 F.3d 312, 324 (3d Cir. 2018) (quoting Susinno v. Work Out World Inc., 862 F.3d 346, 348 (3d Cir. 2017)).

Similarly, the Seventh Circuit determined that a plaintiff had standing to pursue her adverse action claim, finding that an informational injury can be concrete when the plaintiff is entitled to receive and review substantive information because "[p]roviding context may be more valuable than contesting accuracy" since "information that seems damning at first glance might not be so bad in context." Robertson v. Allied Sols., LLC, 902 F.3d 690, 697 (7th Cir. 2018).

On the other side, the Ninth Circuit has found Article III standing wanting when the plaintiff failed to show "actual harm or a material risk of harm." Dutta v. State Farm Mut. Auto. Ins. Co., 895 F.3d 1166, 1176 (9th Cir. 2018). The Dutta court reasoned that none of the inaccuracies or explanations the plaintiff would have provided to the prospective employer would have changed the employer's decision to deny admission into its hiring program. Id.

The harm present in the cases where courts found standing for a violation of 15 U.S.C. § 1681b(b)(3)(A)(i) was premised on a prospective employee's right to discuss with an employer the information in the consumer report prior to the employer taking an adverse action. However, the right to pre-action explanation to the employer is not unambiguously stated in the text of the statute. To find such a right, we would have to infer that Congress, by requiring an employer to provide a prospective employee a copy of the consumer report before the employer takes an adverse action, also intended to afford an opportunity for job applicants or employees to explain to the employer any information, both accurate and inaccurate, contained in the report. At least one court examining this issue has concluded that while the FCRA provides a right to dispute inaccurate information in a consumer report, there is no right mandating an employer provide a prospective or current employee an opportunity to dispute or explain the contents of the report directly with the employer. Walker v. Fred Meyer, Inc., 953 F.3d 1082, 1092 (9th Cir. 2020). In Walker, the court concluded there was no provision of the FCRA that establishes a right to dispute a report with an employer directly, as opposed to with the consumer reporting agency, and noted the lack of authority to suggest the right to dispute is broader than what is set forth in the plain language of the statute. Id. at 1093.

The legislative history comports with the <u>Walker</u> court's interpretation. When Congress amended the FCRA in 1996, the "driving force behind the changes was the significant amount of inaccurate information that was being reported by consumer reporting agencies and the difficulties that consumers faced getting such errors corrected." S. Rep. No. 108-166, at 5-6 (2003). In addressing this issue, the Committee expressed concerns regarding employers' use of consumer reports because they "may create an improper invasion of privacy." S. Rep. No. 104-185, at 35 (1995). The Committee was also concerned about the "unreasonable harm" current and prospective employees may endure "if there are errors in their reports." <u>Id.</u> The Committee bill, therefore, required employers, before taking an adverse action based on a consumer report, to give the current or prospective employee "a copy of the report, a description of the individual's rights under the FCRA, and a reasonable opportunity to respond to any information that is disputed by the consumer." <u>Id.</u>; <u>see also</u> H.R. Rep. No. 103-486 (1994) (documenting under "Explanation of Legislation Title I – Amendments to Fair Credit Reporting Act – Sec. 103. Furnishing Consumer Reports; Use for Employment Purposes" that employers "must also provide the consumer with a reasonable period to respond to any information in the report that the consumer disputes and with written notice of the opportunity and time period to respond"). The legislative history does not evince a right afforded to an employee or prospective employee to provide context as to negative information in a consumer report nor otherwise discuss directly with the employer accurate information in the report.

Neither the text of the FCRA nor the legislative history provide support for Schumacher's claim that she has a right under the FCRA to not only receive a copy of her consumer report, but also discuss directly with the employer accurate but negative information within the report prior to the employer taking adverse action. While it is true that Schumacher did not receive a copy of her report prior to rescindment of the job offer, she has not claimed the report was inaccurate. SC Data wrote on the report the reason for the job offer withdrawal—the undisclosed felony convictions. Schumacher may have demonstrated an injury in law, but not an injury in fact. One of the primary goals of the FCRA is to protect consumers and employees

from the dissemination of inaccurate information. We decline Schumacher's request to create an additional right under the FCRA—that is, the right to explain to a prospective employer negative but accurate information in a consumer report prior to the employer taking an adverse employment action. Schumacher's adverse action claim is not redressable under the plain language of the statute.

## B.     Improper Disclosure Claim

Schumacher next asserts that SC Data obtained her consumer report without first providing her with a disclosure form that complied with the FCRA. Specifically, Schumacher contends the disclosure was not clear and conspicuous because most of the text in the Authorization was no larger than six-point font, constituting "eye-straining text" within "a host of non-disclosure language." App. Br. at 23. She also contends the Authorization was non-conforming because it did not use the words "consumer report" and did not tell her that a consumer report may be procured for employment purposes, although it did expressly inform her that a criminal background search would be conducted only after an offer of employment was made. Another alleged non-conforming defect was that the Authorization violated the "solely" mandate by including extraneous information, such as a statement regarding the consequences for failing to provide accurate or complete information, information applicable only to those applying for motor carrier positions, release of liability provisions, and information about what to do if the report contains disputed information.

When a consumer report is procured for employment purposes, the FCRA requires an employer to provide to the applicant "a clear and conspicuous" written disclosure "in a document that consists solely of the disclosure." 15 U.S.C. § 1681b(b)(2)(A)(i). Even so, "Congress did not enact § 1681b(b)(2)(A)(i) to protect job applicants from disclosures that do not satisfy the requirements of that section; it did so to decrease the risk that a job applicant would unknowingly consent to allowing a prospective employer to procure a consumer report." Groshek v. Time Warner Cable, Inc., 865 F.3d 884, 888 (7th Cir. 2017).

-10-

This Court has held that, without something more, a technical violation under § 1681b(b)(2)(A) is insufficient to confer standing. See Auer v. Trans Union, LLC, 902 F.3d 873, 877 (8th Cir. 2018) (even if there are technical violations of the statute, a plaintiff who consents to the procurement of her consumer information for employment purposes must specifically plead facts of an intangible injury sufficient to show she suffered a concrete injury); see also Groshek, 865 F.3d at 887 (finding no concrete privacy injury in light of employee's admission that he signed the disclosure and authorization form and made no allegation that he was confused by it). The "something more" may encompass facts indicating the additional information caused confusion as to the consent being given; that the employee would not have provided consent but for the extraneous information; or that the disclosure was so lacking in clarity that the employee was unaware that a consumer report would be procured. Groshek, 865 F.3d at 887. Absent specific facts describing the harm, a plaintiff has alleged nothing more than a statutory violation "completely removed from any concrete harm or appreciable risk of harm." Id.

Schumacher's improper disclosure claim consists of a panoply of alleged defects in the Authorization along with an allegation that SC Data acted in willful disregard of the Federal Trade Commission's guidance and the unambiguous language of the statute. Notably absent is any claim of harm, neither tangible nor intangible. Schumacher has not established that she suffered a concrete injury due to the improper disclosure. She lacks standing to pursue her improper disclosure claim. See TransUnion, 141 S. Ct. at 2206 (explaining persons not seeking to remedy any harm to themselves but instead are simply seeking to ensure a defendant's compliance with the law lack Article III standing).

C.     **Failure to Authorize Claim**

Schumacher's last claim is that she did not authorize SC Data to obtain a consumer report. She did, however, explicitly authorize Sterling Infosystems to conduct a criminal background search and "make an independent investigation of [her] criminal records maintained by public and private organizations."

-11-

The document prepared by Sterling Infosystems was titled "Background Screening Report." While the report contained information about Schumacher's criminal history, it did not contain any information about Schumacher's credit history or worthiness, personal characteristics, or other information that is typically included in a comprehensive consumer report. Nonetheless, the Authorization (and report obtained by SC Data), though not employing the term "consumer report," fits within the FCRA's broad definition of consumer report set forth in 15 U.S.C. § 1681a(d)(1).

The FCRA precludes an employer from obtaining a consumer report unless the employee "has authorized in writing . . . the procurement of the report." 15 U.S.C. § 1681b(b)(2)(A)(ii). It is indisputable that Schumacher authorized SC Data to obtain a type of consumer report documenting her criminal history. Sterling Infosystems utilized several databases to conduct an expansive criminal background check. The only arguable search that was "non-criminal" pertained to the database search listed as "National Sex Offender."

As noted by SC Data, there is a public National Sex Offender Website that enables anyone to search for the identify and location of convicted sex offenders. https://www.fbi.gov/scams-and-safety/sex-offender-registry (last visited Feb. 24, 2022). The public website, coordinated by the United States Department of Justice, allows an individual to search for the latest information on known sex offenders from all 50 states, the District of Columbia, Puerto Rico, Guam, and numerous Indian tribes. In contrast, the National Sex Offender Registry is a database available only to law enforcement that is maintained by the Federal Bureau of Investigation's Criminal Justice Information Services Division. Schumacher does not suggest nor is there evidence to indicate the database used by Sterling Infosystems went beyond the information available in the public database. By definition, a person would only be included in the database if he or she had a qualifying criminal conviction for a sex offense. The sex offender database has a relationship to a person's criminal background. Because Schumacher consented to a criminal background check, which a search of a sex offender registry is not so unrelated to criminal history so as to

-12-

plainly fall outside the scope of the Authorization, Schumacher has failed to plead an intangible injury to her privacy that is sufficient to confer Article III standing. See Auer, 902 F.3d at 877 (finding no intangible injury sufficient to confer standing when a plaintiff's consents to the invasion of a protected interest).

Assuming *arguendo* that conducting a search in the national sex offender database went beyond the scope of Schumacher's authorization because it is "non-criminal" in nature, the only possible harm noted by the district court was invasion of privacy. Schumacher, however, has not pleaded any facts demonstrating a concrete harm—a prerequisite for Article III standing. See Sofka v. Thal, 662 S.W.2d 502, 509-10 (Mo. 1983) (en banc) (noting "invasion of privacy" is a general term used to describe four different torts, each with distinct elements and a separate interest that can be invaded); see also Auer, 902 F.3d at 878 (explaining speculative harm, a "naked assertion" of harm devoid of further factual development, and even general factual allegations of injury fall short of plausibly establishing injury sufficient for Article III standing). Schumacher lacks standing to pursue her failure to authorize claim.

## III.  CONCLUSION

For the foregoing reasons, we vacate the district court's orders. When a case is in federal court because it has been removed there by the defendant and it turns out the district court lacks subject matter jurisdiction to decide the claims, "the case shall be remanded." 28 U.S.C. § 1447(c); see Wallace v. ConAgra Foods, Inc., 747 F.3d 1025, 1033 (8th Cir. 2014) (noting that if a case has been removed to federal court and the plaintiff lacks Article III standing to confer federal jurisdiction, "the federal court *must* remand the case to the state court from whence it came"). We remand to the district court with instructions to return this case to the state court.

KELLY, Circuit Judge, concurring.

I agree that Schumacher has failed to allege an injury in fact and therefore lacks standing to pursue her claims under the FCRA. I write separately to clarify my reasoning and my understanding of the scope of the court's ruling.

I agree that SC Data obtained a credit report, as defined by the FCRA, and took an adverse action as to Schumacher before providing her with a copy of that report, in violation of the statute. In light of the Supreme Court's decision in Spokeo, Inc. v. Robins, the question then is whether Schumacher has alleged a "concrete injury" or only "a bare procedural violation, divorced from any concrete harm." 578 U.S. 330, 341 (2016). Here, Schumacher has not alleged any harm that arose from SC Data's failure to provide a copy of the report before informing her of the adverse employment action. She was ultimately provided with a copy of the report, and she has not suggested there was anything in that report she would have disputed if not for the fact that SC Data withdrew her offer of employment before providing the copy. Therefore, Schumacher has not pleaded an essential element of constitutional standing—a concrete injury.

Second, I agree that the legislative history highlighted in the court's opinion suggests that Congress's focus was on "disputed" information in a consumer report. This is relevant because in Spokeo the Supreme Court noted that Congress plays a role in "identifying and elevating intangible harms" when it legislates and that Congress's judgment is "instructive and important," though not definitive, in identifying intangible harms for purposes of constitutional standing. Id. To the extent the court relies on the legislative history of the FCRA to conclude that Congress identified and elevated only intangible harms that involve *disputed* information, I agree that a "dispute" is necessary for a plaintiff to have standing.[2]

---

[2]I also note that the term "disputed" used in the statute's legislative history is not an exact synonym for "inaccurate." One can imagine factual scenarios in which a consumer genuinely "disputes" information contained in a report without it being

-14-

I do not understand our opinion as going further, as that would inappropriately collapse the *non-jurisdictional* issues of statutory standing or the scope of a cause of action into the *jurisdictional* question of constitutional standing. As I read the opinion, it does not create a heightened burden for standing in the context of the FCRA or rule out standing in any case where there is an alleged dispute over the information contained in the report and the report is not properly disclosed. In Walker v. Fred Meyer, Inc., the Ninth Circuit reviewed a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), not a motion challenging the court's jurisdiction pursuant to Rule 12(b)(1), see 953 F.3d 1080, 1086 n.2 (9th Cir. 2020), but the citation is relevant to the extent it informs an analysis of the *type* of harm Congress identified for standing purposes. See TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2205 (2021) ("For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."); Davis v. Passman, 442 U.S. 228, 239 n.18 (1979) ("[I]t may be said that *jurisdiction* is a question of whether a federal court has the power, under the Constitution or laws of the United States, to hear a case; . . . *cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." (citations omitted) (emphasis in original)). The scope of a plaintiff's right under the FCRA is a merits question not before this court: the parties in this case entered a settlement agreement as to the merits of Schumacher's claims. The only remaining question is whether the district court has jurisdiction to approve that settlement. I agree that it does not.

One final note as to Schumacher's failure-to-authorize claim. In my view, it is not necessary to speculate whether the "national sex offender" search included in Schumacher's credit report was coextensive with publicly available information on

categorically "inaccurate." That is not the situation alleged here, however, and so further exploration of the distinction is not necessary.

the National Sex Offender Website.  The fact that Schumacher has not alleged SC Data obtained any information beyond the scope of the authorized search is dispositive of the third claim.

_____