# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-2786

_____

United States of America; State of Minnesota, by its Attorney General Keith
Ellison,[1] its Department of Health and its Pollution Control Agency; City of St.
Louis Park; City of Hopkins

*Plaintiffs - Appellees*

v.

Reilly Tar and Chemical Corporation; Housing and Redevelopment Authority of
St. Louis Park; Oak Park Village Associates; Rustic Oaks Condominium, Inc.;
Philips Investment Co.

*Defendant*s

Daikin Applied Americas Inc.; Super Radiator Coils LP

*Movants - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: May 10, 2022
Filed: August 5, 2022

_____

---

[1]Keith Ellison has been appointed to serve as the Attorney General of the State
of Minnesota, and is substituted as appellee pursuant to Federal Rule of Appellate
Procedure 43(c).

Before ERICKSON, MELLOY, and KOBES, Circuit Judges.
_____

ERICKSON, Circuit Judge.

For nearly forty years, there has been ongoing efforts to environmentally remediate the Reilly Tar & Chemical Corporation site in St. Louis Park, Minnesota. In 2019, the site's original consent decree and remedial action plan were amended in a fashion that some neighboring parties oppose. At issue is whether the neighboring parties may intervene to oppose the amended consent decree. Because the neighboring parties lack Article III standing, we hold they may not, and we affirm the judgment of the district court.[2]

## I. BACKGROUND

Between 1917 and 1972, a subsidiary of Reilly Tar & Chemical Corporation ("Reilly Tar") operated a coal distillation and wood treatment business in the City of St. Louis Park, Minnesota (the "Reilly Tar Site"). As a result of Reilly Tar's operations, environmentally toxic chemicals seeped into aquifers below and contaminated the surrounding areas' drinking water. In 1972, the City of St. Louis Park agreed to purchase the Reilly Tar Site "as is." The City agreed to hold Reilly Tar "harmless from any and all claims" that the State of Minnesota might assert, make no claim against Reilly Tar relating to soil and water impurities, and assume full responsibility to restore the property to "any condition that may be required by the Minnesota Pollution Control Agency" (the "MPCA"). Shortly thereafter, the United States and State of Minnesota sued Reilly Tar pursuant to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606–07.

_____

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

## A. The 1986 Consent Decree

In 1986, the United States, the State of Minnesota, Reilly Tar, the City of St. Louis Park, the City of Hopkins, the Housing & Redevelopment Authority of St. Louis Park, Oak Park Village Associates, and Philip's Investment Company entered a consent decree and integrated remedial action plan (collectively, the "1986 Consent Decree"). The 1986 Consent Decree identified certain chemical substances to be remediated through a water treatment pump program and a groundwater monitoring plan. It sought to flush out identified contaminants including, maintenance substances like "solvents and degreasers," polynuclear aromatic hydrocarbons ("PAH"), and phenolic compounds. To accomplish this goal, the 1986 Consent Decree implemented a "granular activated carbon (GAC) treatment system," which is known as the "Pump Program." The Pump Program required Reilly Tar to pump and treat at least 200 million gallons of water per year (with a minimum of 10 million gallons per month) in order to "remove and/or control the flow of PAH and Phenolic Contaminants in aquifers beneath St. Louis Park" and minimize the migration of those contaminants. The program would continue "until such time as the [Environmental Protection Agency] Regional Administrator and Director approve[d] discontinuing use of the system" pursuant to certain "cessation criteria." The 1986 Consent Decree also required Reilly Tar to investigate various leaking aquifer wells and to abandon or reconstruct any well identified.

## B. The 2019 Consent Decree

Over the next decades, Reilly Tar merged with another company to form Vertellus Specialties, Inc., and the resultant company declared bankruptcy. In response, the parties to the 1986 Consent Decree decided to amend their agreement with a view towards dismissing any claims they might have against Reilly Tar and remove Reilly Tar and its successors as parties to the 1986 Consent Decree. The amendments also sought to have only the Environmental Protection Agency ("EPA"), the State of Minnesota, and the City of St. Louis Park remain as active members of the amended consent decree. The proposed three remaining active

parties sought the district court's approval to update and amend the 1986 Consent Decree to reflect four developments: "(1) changes in the understanding of the toxicology of the relevant contaminants . . . ; (2) modifications to the conceptual site model; (3) continuing implementation of the remedy; and (4) [an update about] the status of the Parties."

The proposed amended consent decree also included an accompanying remediation plan (collectively, the "2019 Consent Decree"), which defined the targeted "Chemicals of Interest" to mean "site-related [PAH] and other site-related contaminants identified in the [a]mended" remediation action plan. The amended remediation action plan contained three tables that identified PAH compounds, benzene, and other chemicals to be remediated. The 2019 Consent Decree did not contain the 1986 Consent Decree's "solvents and degreasers" language.

The 2019 Consent Decree also altered the Pump Program. In this new plan, contaminated water still needed to be treated by GAC or another method approved by the EPA, MPCA, and the Minnesota Department of Health ("MDH") and their successors, but the 1986 Consent Decree's explicit 200-million-gallon pumping quota was removed. The 2019 Consent Decree gave the parties greater flexibility to change the specifics of the well pumping program, allowing the parties to determine where the well pumping process would take place and the rate of pumping, subject to EPA's approval with input from the City of St. Louis Park, the MPCA, and the MDH. If a party sought to end water pumping at a particular location, a schedule for a cessation pilot test was required.

The 2019 Consent Decree added a contribution provision, which was not present in the 1986 Consent Decree. This provision provided that the City of St. Louis Park would have no liability to the federal government and would be entitled "to protection from contribution actions or claims as provided by CERCLA Section 113(f)(2) [(42 U.S.C. § 9613(f)(2))], or as may be otherwise provided by law, for the 'matters addressed'" in the amended consent decree. "Matters addressed" was defined as "all response actions taken or to be taken and all response costs incurred

-4-

or to be incurred, at or in connection with the Site, by the United States or any other person," subject to certain identified exceptions.

### C. Proposed Intervenors Daikin Applied Americas, Inc. & Super Radiator Coils LP

Daikin Applied Americas, Inc., and Super Radiator Coils LP (collectively, the "Proposed Intervenors") owned property about 0.2 miles downgradient from the Reilly Tar Site (the "Proposed Intervenors' Site"). From approximately 1949 until 1998, that property was used for metal fabrication. Since 2015, the Proposed Intervenors have been remediating contamination from perchloroethylene ("PCE") and its degrading compounds at their property. PCE is a chlorinated volatile organic compound (a "CVOC"). Part of the Proposed Intervenors' remediation process is they must test the groundwater and soil and send the results to the MPCA. The Proposed Intervenors allege that the MPCA has recently begun requiring them to investigate and remediate additional contaminants they believe are migrating from the Reilly Tar Site onto their property.

In November 2019, after the proposed 2019 Consent Decree was published in the Federal Register for comment, the Proposed Intervenors submitted a public comment. The EPA and MPCA responded to their comments and then submitted the proposed 2019 Consent Decree to the district court for approval. Dissatisfied with the responses to their comments and the terms of the proposed amended decree, the Proposed Intervenors moved to intervene. The Proposed Intervenors argued that multi-aquifer wells were leaking contaminants despite the 1986 Consent Decree and that the proposed 2019 Consent Decree would worsen the spread of contaminants. According to the Proposed Intervenors and their environmental consultants, the Reilly Tar Site was the source of PAHs, phenolics, volatile organic compounds ("VOCs"), CVOCs (including PCE), and other contamination, yet the proposed 2019 Consent Decree did "nothing to remediate or reduce the migration" of those contaminants. They also asserted the changes to the Pump Program and other remedies actually "threaten[ed] to increase the migration of such contaminants"

from the Reilly Tar Site to the Proposed Intervenors' Site and surrounding neighborhoods. The Proposed Intervenors alleged they had already suffered harm as a result of the contamination migration coming from the Reilly Tar Site and they would be further injured by the entry of the 2019 Consent Decree because (a) the MPCA had delayed the Proposed Intervenors' remediation efforts until they had investigated the contaminants coming from the Reilly Tar Site, and (b) the new decree would increase the influx of PCE and other contaminants from the upgradient site, significantly increasing their remediation costs. The Proposed Intervenors sought the following relief: (1) remediation for "solvents and degreasers," which, they contended, included remediation for CVOCs and VOCs; (2) monitoring for CVOCs and VOCs so that the affected parties would understand the full impact of the migration from the Reilly Tar Site; (3) continuation of the Pump Program as originally implemented; and (4) protection of any contribution rights the Proposed Intervenors may have.

Following a hearing, the district court found the Proposed Intervenors lacked Article III standing because they could not demonstrate their alleged harm was traceable to the 2019 Consent Decree or otherwise redressable. The court concluded that neither the 1986 Consent Decree nor the proposed 2019 Consent Decree required Reilly Tar to remediate for CVOCs, including PCE. The district court further concluded that the Proposed Intervenors' sole interest was not the 2019 Consent Decree, but rather in creating a new consent decree that would make Reilly Tar newly responsible for PCE contamination.

If Reilly Tar was found responsible for PCE or other contamination on the Proposed Intervenors' Site, the court concluded that the 2019 Consent Decree's contribution provision would not affect their potential contribution rights. In other words, the 2019 Consent Decree engendered no new harm to the Proposed Intervenors. The court noted that even if the Proposed Intervenors had Article III standing, they had no statutory right of intervention under CERCLA or under Federal Rule of Civil Procedure 24. The district court entered the 2019 Consent

Decree and denied the Proposed Intervenors' request for permission to file a motion for reconsideration. The Proposed Intervenors now appeal.

## II.  DISCUSSION

The Proposed Intervenors assert they are harmed by the 2019 Consent Decree because (1) the new provisions increase the flow of CVOCs (including PCE) and other contaminants onto their property which will increase the cost of their MPCA-decreed remediation, and (2) it severs their potential contribution rights against the parties responsible for the contamination migration. In response, the United States, State of Minnesota, the MPCA, and City of St. Louis Park (collectively, the "Government") argue the Proposed Intervenors' alleged harms are speculative and do not establish standing. They contend that CVOCs (like PCE) were never part of either the 1986 or 2019 Consent Decree and that the 2019 Consent Decree leaves the Proposed Intervenors' potential contribution rights intact.

To intervene, interested parties must demonstrate they meet the elements of Article III standing plus the requirements of Federal Rule of Civil Procedure 24. See Fed. Trade Comm'n v. Johnson, 800 F.3d 448, 451–52 (8th Cir. 2015). We review the district court's determinations on both standing and intervention *de novo*, "accept[ing] as true all material allegations in the motion to intervene and . . . constru[ing] the motion in favor of the prospective intervenor." Nat'l Parks Conservation Ass'n v. EPA, 759 F.3d 969, 973–74 (8th Cir. 2014).

A party seeking to pursue relief in federal court must establish it has Article III standing by demonstrating: (1) it "suffered an injury in fact," (2) that injury "is fairly traceable to the defendant's challenged action," and (3) there is a likelihood "that the injury will be redressed by a favorable judicial decision." Cross v. Fox, 23 F.4th 797, 800 (8th Cir. 2022) (quoting Hawse v. Page, 7 F.4th 685, 688 (8th Cir. 2021)). An "injury in fact" has been construed by the Supreme Court as meaning "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Schumacher v. SC Data Ctr.,

Inc., 33 F.4th 504, 509 (8th Cir. 2022) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016)) (internal quotation marks omitted). The injury is considered "fairly traceable" to the defendant's conduct if, for instance, "the defendant will be compelled to cause the alleged injury to the intervenor if the plaintiff prevails." Am. C.L. Union of Minn. v. Tarek ibn Ziyad Acad., 643 F.3d 1088, 1093 (8th Cir. 2011).

Even assuming the Proposed Intervenors show a concrete injury by having to spend money to remediate their property,[3] there are causality issues that preclude Article III standing. The Proposed Intervenors' contention that the 2019 Consent Decree will increase the migration of CVOC contaminants from the Reilly Tar Site to their own property is based on two unfounded assumptions: (1) it presumes that the CVOC contaminants were subject to remediation by the 1986 Consent Decree, and (2) the 2019 Consent Decree significantly changes CVOC remediation at the Reilly Tar Site.

The Proposed Intervenors acknowledge the 1986 Consent Decree is silent about CVOCs (including PCE) and thus rely on the decree's remediation of certain "solvents and degreasers" as evidence that it covered CVOCs. They read too much into "solvents and degreasers" since the 1986 Consent Decree never defined "solvents and degreasers," nor did it provide any meaningful contextual clues indicating the phrase was intended to encompass CVOCs. The remedial action plan attached to the 1986 Consent Decree stated its purpose, noting it was designed to "remove and/or control the flow of PAH and Phenolic Contaminants." Its appendices specify the types of "PAH Compounds to be Monitored" without mentioning CVOCs. In the one instance where the 1986 Consent Decree uses the

---

[3]The Proposed Intervenors' assertions of generalized threats to "public health" are insufficient to demonstrate injury in fact. See Carney v. Adams, 592 U.S. ____, 141 S. Ct. 493, 498 (2020) ("[A] grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interests . . . does not count as an 'injury in fact.' And it consequently does not show standing.").

word "volatiles,"[4] it is remote from the provisions regarding "solvents and degreasers," it is not qualified as "chlorinated volatiles, and it is in a context that has no connection to CVOC remediation.  The 1986 Consent Decree did not cover CVOCs.

We are unpersuaded by the Proposed Intervenors' argument that the 2019 Consent Decree's deletion of the "solvents and degreasers" language relieves Reilly Tar of its duty to remediate CVOCs.  The 1986 Consent Decree never covered CVOCs, and the 2019 Consent Decree maintains the status quo regarding CVOC remediation.  The 2019 Consent Decree defines its targeted "Chemicals of Interest" to mean "site-related [PAH] and other site-related contaminants identified in the [a]mended [remedial action plan]."  The amended remedial action plan contains three tables of Chemicals of Interest—none of which have been identified as CVOCs by the parties.  Given that neither consent decree required Reilly Tar to clean-up CVOCs (and more specifically, PCE), the entry of the 2019 Consent Decree is not a causal link of the Proposed Intervenors' harm because that decree does not alter Reilly Tar's preexisting duties regarding PCE.  See Tarek ibn Ziyad Acad., 643 F.3d at 1093 (noting an intervenor satisfies the traceability requirement if the defendant will be compelled to cause the injury if the plaintiff prevails).

The Proposed Intervenors next contend Reilly Tar is the source of massive CVOC and other contamination migration and the 2019 Consent Decree's revamping of the Pump Program plus other remediation measures are exacerbating that migration onto their property.  They claim the MPCA is forcing them to investigate and pay for Reilly Tar's contamination on their own property.  Assuming these assertions are true, the Proposed Intervenors have failed to trace their alleged injury to the entry of the 2019 Consent Decree.  Because PCE was never part of either consent decree, the Proposed Intervenors' additional expenditures are not a result of the entry of the 2019 Consent Decree—they would have spent money on

---

[4]Benzene and naphthalene are VOCs that were included in the 1986 Consent Decree, but they are not CVOCs.

PCE remediation regardless of the 2019 Consent Decree. Any additional money the Proposed Intervenors expend to remediate PCE and other contaminants (their alleged harm) is traceable to (1) the MPCA's demands and/or (2) the nonexistence of a consent decree requiring Reilly Tar to remediate for CVOCs (specifically, PCE), which are not part of this litigation.

All parties admit (and the 2019 Consent Decree acknowledges) that CVOCs are present on or near the Reilly Tar Site. If Reilly Tar is found to be legally responsible for contamination on the Proposed Intervenors' Site, the contribution provision in the 2019 Consent Decree does not infringe upon the Proposed Intervenors' right to seek contribution. The 2019 Consent Decree declares that the contribution provision only applies to "matters addressed" in that decree, referring to "costs incurred or to be incurred" and "response actions taken or to be taken" at or in connection with the Reilly Tar Site. See 42 U.S.C. § 9613(f) (discussing CERCLA contribution provisions and "matters addressed" in a CERCLA settlement); see also 42 U.S.C. § 9607(a) (CERCLA liability). The Government has assured the Proposed Intervenors that they "simply have no cost responsibilities" at the Reilly Tar Site. In other words, the Government recognizes that nothing in the 2019 Consent Decree hinders the Proposed Intervenors from seeking contribution from other parties (including the settlors) if the Proposed Intervenors establish those parties are responsible for the remediation costs on the Proposed Intervenors' Site.

Given this assurance and the conclusion that the 2019 Consent Decree does not alter Reilly Tar's CVOC remediation obligations, the Proposed Intervenors have not shown a traceable or redressable injury, which are requirements for Article III standing. Because the Proposed Intervenors lack standing, we have no authority to analyze their remaining claims. See Johnson, 800 F.3d at 451.

## III.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____