RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

THOMAS MERCK, individually and as a representative
of the Class,

     *Plaintiff-Appellant*,

  *v.*

WALMART, INC.,

     *Defendant-Appellee*.

No. 23-3698

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-02908—Sarah Daggett Morrison, District Judge.

Argued: July 18, 2024

Decided and Filed: August 20, 2024

Before: CLAY, McKEAGUE, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Thomas Scott-Railton, GUPTA WESSLER LLP, Washington, D.C., for Appellant.
James N. Boudreau, GREENBERG TRAURIG, LLP, Philadelphia, Pennsylvania, for Appellee.
**ON BRIEF:** Thomas Scott-Railton, Matthew W.H. Wessler, GUPTA WESSLER LLP,
Washington, D.C., E. Michelle Drake, Joseph C. Hashmall, BERGER MONTAGUE PC,
Minneapolis, Minnesota, for Appellant. James N. Boudreau, GREENBERG TRAURIG, LLP,
Philadelphia, Pennsylvania, Naomi G. Beer, GREENBERG TRAURIG, LLP, Denver, Colorado,
for Appellee. Brianne J. Gorod, CONSTITUTIONAL ACCOUNTABILITY CENTER,
Washington, D.C., for Amicus Curiae.

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge.  Before an employer can take any adverse action against a prospective employee based on a negative consumer report, the Fair Credit Reporting Act requires that the employer provide him with a copy of the report. When Thomas Merck applied to work at Walmart, he forgot to disclose an old misdemeanor conviction. The conviction came up on a consumer report. Walmart—through a third-party vendor—gave Merck an incomplete version of the report that listed his misdemeanor and indicated he was "not competitive" for a job at Walmart, even though it had already given him a conditional job offer. Then Walmart revoked the offer.

The question is whether Merck has constitutional standing to sue Walmart under the Act for the procedural injury he alleges he suffered when Walmart failed to give him the full consumer report. Merck has failed to point to sufficient evidence of adverse effects to survive summary judgment on his informational-injury theory of standing. And his other standing theories fail as a matter of law. We **AFFIRM** the district court.

**I.**

**A.    Facts**

In April 2016, Thomas Merck applied to work in an entry-level position at the Walmart in Coshocton, Ohio. Walmart decided to interview Merck within a month after he applied. After the interview, the interviewer told Merck that "everything looked really good." Merck Dep., R.105-3 at PageID 2267. She saw no reason why he "would not be hired." *Id.* Then she told him that they "had to do a background check as a formality." *Id.* "As soon as that came back," Merck testified that "[he] would be contacted with a schedule to start." *Id.* At this point, Walmart had extended Merck a job offer conditioned on the successful completion of a background check.

Walmart asked Merck to fill out a form authorizing the background check. It also asked him to fill out another form indicating whether he had any prior criminal convictions. Merck

affirmed that, no, he did not have any prior convictions. He later testified that he had forgotten entirely about a misdemeanor that had occurred roughly fifteen years prior.

Using that authorization, Walmart ordered a background report on Merck from a third-party vendor. The vendor's investigation uncovered Merck's misdemeanor conviction. Under Walmart's policy, the vendor scored Merck's report as "Not Competitive"—meaning that Merck would not be hired—because he had not disclosed the conviction.

The vendor sent Merck a version of the report that indicated—under the "County Record" section of the criminal background check—that he was "Not Competitive" to be hired at Walmart. The report said that the vendor had uncovered "public record information that is likely to have an adverse effect on your ability to obtain employment" with Walmart. Merck Report, R.101-10 at PageID 1841. Merck's misdemeanor conviction appeared later in the document. The vendor sent Merck an accompanying letter explaining his rights under the Fair Credit Reporting Act. The communication further urged Merck to call the vendor's compliance department if he believed any of the information in the report was inaccurate or incomplete. Walmart received a slightly different version of the report. On Walmart's version, under Merck's "County Record" section, the report indicated that Merck was "Not Competitive." But the report *also* listed a code—"Grade Description: R3." To Walmart, that code indicated that the vendor had found an item that had not been disclosed by the job applicant. Just over a week after the vendor sent the initial report, Walmart sent Merck a final notice explaining that it had revoked his conditional job offer.

Before the final notice, Merck called either the vendor or Walmart to ask why he was "Not Competitive" according to his background check. He doesn't remember much about what he was told, but he remembers thinking that he had not received an adequate answer. He testified that if he had seen the "R3" code listed on the report that he received, he would have at least asked Walmart what it meant. He says that, without additional context, he thought maybe he hadn't been hired because of the conviction.

But Merck didn't know he hadn't been hired because of his failure to *disclose* the conviction. *See* Merck Dep., R.105-3 at PageID 2219; *see also* Magistrate Judge Order, R.70 at

PageID 927–28 (explaining that "isolated testimony" suggesting that Merck thought his failure to be hired might have been caused by a failure to disclose the conviction was "taken out of context" and "stood in contrast" to his "more specific testimony" that he didn't learn about the real basis of the adverse action until later). Merck and his attorneys affirmed that they didn't know about the code indicating a self-disclosure issue until March 2019, when he began discovery in separate litigation with the third-party vendor. Merck testified several times—and his attorney clarified—that he thought his application had been rejected because of the conviction itself, not his failure to disclose it. *See* Merck Dep., R. 105-3 at PageID 2219–22, 2237–38, 2306.

Walmart acknowledged that if Merck had initially disclosed the misdemeanor, he would have been scored a "Competitive" applicant. But a Walmart employee also testified that, because the background report contained accurate information about his conviction, his only option under then-effective Walmart policy was to reapply—in other words, he could not have changed the outcome by explaining the mistake. And although Merck argues that there is "uncertainty" about Walmart's exercise of its "final hiring authority," *see* Reply Br. 22, he doesn't point to any specific evidence in the record suggesting Walmart would have acted contrary to its policy had he been able to explain his mistake.

Later in 2016, Merck applied twice more for a job at Walmart. He never received another interview, conditional offer, or formal opportunity to fill out a criminal-record history for Walmart. He notes that he may have called Walmart several times to check on the status of his later applications, though he doesn't specifically remember doing so.

In 2016 he sued the third-party vendor for violating the Fair Credit Reporting Act by disclosing adverse information about him that was more than seven years old. He settled his claims with the vendor. In early 2017, he applied to another job with a different employer—this time, disclosing his misdemeanor conviction when the employer asked him about his background. He did so, he says, because he "found out" that the misdemeanor "held . . . up" his job offer at Walmart, and he wanted to make sure potential future employers knew about it. Merck Dep., R.105-3 at PageID 2213. He got the job.

**B.      Procedural History**

Merck began this lawsuit in June 2020. He asserts one claim on behalf of himself and a putative class, contending that Walmart violated the Fair Credit Reporting Act by willfully "failing to provide applicants and employees with a full copy of their consumer reports prior to taking adverse action against them." Am. Compl., R.16 at PageID 74; *see* 15 U.S.C. §§ 1681b(b)(3)(A), 1681n. The district court denied Walmart's first attempt to dismiss, reasoning that Merck had standing because he adequately alleged he was deprived of a procedural benefit under the Act.

Soon thereafter, the Supreme Court handed down *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), which clarified how to assess a plaintiff's constitutional standing under the Fair Credit Reporting Act. This Court also decided *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357 (6th Cir. 2021) [hereinafter *Ward I*], which applied the *TransUnion* framework to assess constitutional standing in an action under the Fair Debt Collection Practices Act. Specifically, *Ward I* clarified that a procedural violation, standing alone, does not create a concrete injury in fact under *TransUnion*'s constitutional standing doctrine. *Ward I*, 9 F.4th at 361. And the *Ward I* panel further found the plaintiff had suffered no concrete harm that "flowed from" the statutory violation. *Id.* at 363 (cleaned up). So he had failed to establish constitutional standing.

With the benefit of new caselaw, Walmart renewed its standing argument in a motion for summary judgment. This time, the district court granted the motion, finding that Merck's alleged statutory injury did not resemble a harm that has traditionally been recognized in American courts, as is required under *TransUnion*. And the court determined that Merck had failed to show any independent concrete injury that flowed from the statutory violation. Finally, the court held that Walmart's actions did not cause the adverse employment action because (1) the report was not inaccurate, and (2) Walmart testified that it would not have hired Merck even if he had been able to explain that he had mistakenly omitted the misdemeanor from his paperwork.

Merck timely appealed.

**II.**

We review de novo the grant of summary judgment for lack of standing. *See McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016). We must affirm where there is no genuine dispute of any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). But if evidence suggests that a reasonable jury could find for the nonmoving party, we must reverse. *See McKay*, 823 F.3d at 866. And if the district court erred by incorrectly determining that the moving party was entitled to judgment under the law, we must also reverse. We view evidence and draw reasonable factual inferences in the most favorable light for the nonmoving party. *Id.* At summary judgment, a plaintiff may not rely on mere allegations to show standing. *Ward I*, 9 F.4th at 361. Instead, he must set forth "specific facts" that demonstrate that he has satisfied Article III's requirements to bring his suit. *Id.*

**III.**

Congress passed the Fair Credit Reporting Act in 1970 to ensure "fair and accurate credit reporting" and "protect consumer privacy." 15 U.S.C. § 1681(a)(1); *TransUnion*, 594 U.S. at 418. As relevant here, the Act requires that any person who intends to use a "consumer report" as the basis for taking "any adverse" employment action must, before doing so, provide certain information to the consumer who is the subject of the report. 15 U.S.C. § 1681b(b)(3)(A). Specifically, the employer must give the subject "(i) a copy of the report; and (ii) a description in writing" of the consumer's rights under the Act "as prescribed by" the Consumer Financial Protection Bureau. *Id.*; *TransUnion*, 594 U.S. at 418–19.

The Act gives consumers a cause of action to recover statutory, actual, and punitive damages from "[a]ny person who willfully fails to comply with any requirement imposed" under the Act. 15 U.S.C. § 1681n(a). The Act also permits recovery of actual damages from "[a]ny person who is negligent in failing to comply with any requirement imposed" under the Act. *Id.* § 1681o. Both provisions permit recovery of attorneys' fees. *Id.* §§ 1681n(a)(3); 1681o(a)(2). In short, the Fair Credit Reporting Act grants consumers expansive statutory standing to sue any person who violates its procedural and substantive requirements.

The key question in this case is whether plaintiffs like Thomas Merck, who lost a job offer after Walmart failed to provide him with a full copy of the report that caused it to revoke that offer, possess *constitutional* standing under Article III.

The Constitution limits the federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "The case or controversy requirement limits the role of the Federal Judiciary in our system of separated powers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). Federal courts are not open forums for citizens "to press general complaints about the way in which government goes about its business." *Id.* at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). Instead, plaintiffs must have a "personal stake" in the case or controversy—a stake that helps "ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* (first quoting *TransUnion*, 594 U.S. at 423, and then quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982)). To prosecute a lawsuit in federal court, a plaintiff must have this sufficiently concrete stake in the outcome of the case or controversy—in other words, constitutional standing.

## A.

"The fundamentals of standing are well-known and firmly rooted in American constitutional law." *Hippocratic Med.*, 602 U.S. at 380. Standing requires that a plaintiff have (1) suffered an "injury in fact" that (2) was caused by the defendant and (3) likely would be redressed by the judicial relief he requests. *See id.* The plaintiff—the party invoking federal jurisdiction—bears the burden to establish the standing elements. *Ward I*, 9 F.4th at 360.

The central standing dispute in this case concerns whether any injury Merck alleges he suffered qualifies as an injury in fact under the constitutional standing doctrine. That dispute, in turn, hinges largely on whether the statutory injury that Merck asserts—being denied a full copy of the consumer report that formed the basis of Walmart's decision to revoke his job offer—is sufficiently "concrete" to qualify as an injury in fact. In support of his claims, Merck relies on precedent governing "informational" injuries. He also draws several analogies to traditional

common-law and constitutional harms, including the procedural-due-process requirements that govern public employment.

When considering a plaintiff's standing arguments, we assume that the plaintiff's theory of the *merits* of the argument is correct. *See Ward v. NPAS, Inc.*, 63 F.4th 576, 582 (6th Cir. 2023). Merck need only show he "has a right to relief *if* the Court accepts his interpretation of the constitutional or statutory laws on which the complaint relies." *Id.* (cleaned up) (quoting *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021)). In this case, that means we assume that Walmart violated the Fair Credit Reporting Act by failing to provide Merck with the identical report that it received from the third-party vendor before deciding to withdraw his job offer.[1]

Merck has failed to identify specific facts in the record sufficient to support his informational-injury theory at the summary-judgment stage. And he has not shown he has standing under his theories comparing his claim to traditional common-law and constitutional procedural-due-process claims. Accordingly, Merck does not have Article III standing to continue his lawsuit.[2]

**B.**

Under constitutional standing doctrine, an "injury in fact" is an "invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). To be "concrete," the injury must be "real" and not "abstract." *Hippocratic Med.*, 602 U.S. at 381; *see also TransUnion*, 594 U.S. at 424. To determine whether an asserted injury is sufficiently concrete, the Supreme Court has instructed federal courts to consider "history and tradition" as a "guide to the types of cases that Article III empowers federal courts to consider."

---

[1]Merck argues that the Act's use of the definite article "the" to require that the employer provide the potential employee "a copy of *the* report," 15 U.S.C. § 1681b(b)(3)(A)(i) (emphasis added), seems to suggest that a regulated party must provide an *exact* copy of the report used to take the adverse action. We don't decide that issue here. To assess standing, all we must determine is whether Merck has suffered an injury in fact that Walmart caused, crediting his interpretation of the statutory scheme.

[2]Because we determine that Merck did not suffer a concrete injury in fact, we need not determine whether he satisfied the remaining standing elements: causation and redressability.

*TransUnion*, 594 U.S. at 424 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008)). Specifically, in cases addressing statutory schemes like the Fair Credit Reporting Act, the Supreme Court's caselaw teaches that courts should assess whether the asserted injury has a "close relationship" to a harm "traditionally" recognized "as providing a basis for a lawsuit in American courts." *Id.*; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). In short, the "inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 424. Standing doctrine does not "require an exact duplicate in American history and tradition." *Id.* But federal courts may not simply "loosen Article III based on contemporary, evolving beliefs about what kinds of suits should be heard in federal courts." *Id.* at 425.

Some asserted injuries are easy. "Traditional tangible harms," like "physical" or "monetary" harms, "readily qualify." *Id.* (cleaned up). But certain intangible harms might also be sufficiently concrete. For instance, plaintiffs have standing when they assert reputational harms, when a defendant discloses their private information, and when a defendant intrudes on the plaintiffs' seclusion by, for example, sending irritating and unwanted text messages. *Id.* (collecting cases) (citing *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)). Those cases concern modern analogues to traditional common law harms—analogues that Congress incorporated into statutory schemes to allow plaintiffs to bring suit in federal court. Traditional harms also include "harms specified by the Constitution itself." *Id.* (collecting cases). Such injuries might include infringements on free speech or exercise of religion. *See Spokeo*, 578 U.S. at 340 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) and *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993)). They also might include certain kinds of "discriminatory treatment" that, without congressional action, might previously have been inadequate to establish any injury in fact. *See TransUnion*, 594 U.S. at 425–26 (citing *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984)). And, finally, *TransUnion* suggests that "informational injuries" continue to qualify categorically as viable traditional injuries under Article III. *See id.* at 441–42 (first citing *FEC v. Akins*, 524 U.S. 11 (1998), and then citing *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440 (1989)).

Courts give Congress some deference in identifying intangible harms that "meet minimum Article III requirements" and can provide plaintiffs standing to sue in federal court. *Spokeo*, 578 U.S. at 341. Indeed, Congress can "elevate" certain de facto injuries to the "status of legally cognizable," thus granting plaintiffs "a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *TransUnion*, 594 U.S. at 425 (quoting *Spokeo*, 578 U.S. at 341).

But the Supreme Court's recent caselaw has thrown cold water on the notion that Congress may expand the constitutional boundaries that the Court has set out to govern standing. The Constitution is said to set a floor that plaintiffs must clear to have their suits heard in federal court. Congress may not grant a person a right to sue for an injury that falls outside the categories of concrete harms contemplated by the Constitution. *See Spokeo*, 578 U.S. at 341. The fact that Congress enacts a law that "grants a person a statutory right and purports to authorize that person to sue to vindicate that right" does not mean that the person "automatically satisfies the injury-in-fact requirement." *Id.* "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.*

So, when Congress has enacted a broad grant of authority to sue for the infringement of statutory rights, courts maintain a "responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *TransUnion*, 594 U.S. at 426. Importantly, that means that plaintiffs do not have standing to assert "bare procedural violation[s], divorced from any concrete harm." *Spokeo*, 578 U.S. at 341. A bare procedural violation, standing alone, is not sufficiently concrete to confer constitutional standing. But the "violation of a procedural right granted by statute *can* be sufficient in some circumstances to constitute injury in fact." *Id.* at 342 (emphasis added). In those circumstances, Congress can identify a specific harm—outside of merely failing to follow a specific procedure—that qualifies as a concrete injury in fact. "In other words, a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id.* (emphasis in original). The plaintiff must allege the harm that Congress *did* identify, though. And, generally, that harm must bear a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 440.

1.      **Informational injury**

Merck's first theory of standing encompasses what courts often call an "informational injury." Such an injury is the "denial of information" to someone otherwise entitled to it. *Grae v. Corr. Corp. of Am.*, 57 F.4th 567, 569–70 (6th Cir. 2023) (denying motion to intervene in appeal for lack of standing). Before *TransUnion*, courts sometimes held that the mere denial of information could qualify as a concrete injury sufficient to confer standing. *See, e.g.*, *Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747, 755–61 (6th Cir. 2018), *abrogated by TransUnion*, 594 U.S. at 442; *Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008); *Strubel v. Comenity Bank*, 842 F.3d 181, 189–90 (2d Cir. 2016). But *TransUnion* rejected any notion that the denial of information, without more, can satisfy the concreteness element of the constitutional standing doctrine. "An 'asserted informational injury that causes no adverse effects cannot satisfy Article III.'" *TransUnion*, 594 U.S. at 442 (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)). After *TransUnion*, courts—including this one—agree that "a plaintiff claiming an informational injury must have suffered adverse effects from the denial of access to information." *Grae*, 57 F.4th at 570 (collecting cases). And this Court said the same thing even before *TransUnion*. *See Huff v. Telecheck Servs., Inc.*, 923 F.3d 458, 464–69 (6th Cir. 2019) (assessing a plaintiff's claim for the denial of statutorily mandated disclosable information and finding he had failed to show any individual harm). So, to have standing for an informational injury, a plaintiff must allege those two elements: (1) adverse effects that (2) result from the denial of information.

*TransUnion* lays out the contours of what a sufficiently concrete informational injury might be. The case concerned a proposed class action of plaintiffs who found out that their credit reports contained alerts stating their names were "potential" matches to names on a government terrorist watchlist. *See* 594 U.S. at 419–20. The plaintiffs claimed the companies failed to (1) use proper procedures under the Fair Credit Reporting Act to maintain accurate information about them, (2) disclose all required information about them upon request, and (3) provide them with a summary of their rights under the Act. *Id.* at 421. The Court compared the first set of claims to traditional common-law analogues, finding that only the plaintiffs who had their information sent to third parties had standing to pursue their claim. *See id.* at 432–33. And the Court held the

plaintiffs had not shown any concrete harm on the remaining claims: the right to receive information about the plaintiffs and about their rights under the Act. *See id.* at 439–42. The plaintiffs could not demonstrate "any harm at *all*," according to the Court, merely from receiving mailings that did not comply with the formatting requirements in the Fair Credit Reporting Act. *Id.* at 440. "The plaintiffs presented no evidence that, other than" the lead plaintiff, "a single other class member so much as *opened*" the deficient mailings, "nor that they were confused, distressed, or relied on the information in any way." *Id.* (quoting *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1039 (9th Cir. 2020) (McKeown, J., concurring in part), *vacated*, 594 U.S. 413 (2021)). *TransUnion* suggested that, to allege an informational injury, plaintiffs *needed* to show that they relied on the information (or lack thereof) that they received—and that the reliance led to some kind of harm. "Without any evidence of harm caused by the format of the mailings," the alleged violations merely stated "bare procedural violations, divorced from any concrete harm." *Id.* (cleaned up).

The plaintiffs in *TransUnion* also claimed a risk of future harm from receiving improperly formatted credit files—a risk that can, if sufficiently imminent and substantial, qualify as concrete. *Id.* at 423, 441. But "the risk of future harm on its own does not support Article III standing" in the informational injury context—largely because it's difficult to show that a future risk can materialize without there being some actual action taken that makes it more likely that false or misleading credit information might lead to an adverse effect. *Id.* at 436–37, 441. And, the Court continued, "the plaintiffs made no effort here to explain how the formatting error prevented them from contacting TransUnion to correct any errors before misleading credit reports were disseminated to third-party businesses." *Id.* at 441.

The Court distinguished earlier informational injury precedents—*Akins*, 524 U.S. 11, and *Public Citizen*, 491 U.S. 440—by noting that the plaintiffs in *TransUnion* had not alleged "that they failed to receive any required information," unlike in *Akins* and *Public Citizen*. *TransUnion*, 594 U.S. at 441. They alleged only that they received information "*in the wrong format*." *Id.* So neither case governed the plaintiffs' claims. *Akins* and *Public Citizen*, the Court also explained, "involved denial of information subject to public-disclosure or sunshine laws that entitle all members of the public to certain information." *Id.* Such laws implicate the "public's interest in

evaluating matters of concern to the political community." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 338 (7th Cir. 2019). And, finally, the plaintiffs in *TransUnion* identified "no 'downstream consequences' from failing to receive the required information." *TransUnion*, 594 U.S. at 442 (quoting *Trichell*, 964 F.3d at 1004).

All this boils down to a fine line between an injury involving merely the denial of information subject to mandatory disclosure by statute—insufficient for standing—and a denial of information that causes "downstream consequences"—sufficiently concrete to establish standing. *See id.* at 441–42. The Supreme Court's precedents have led the Sixth Circuit to explain that certain "intangible harms—like the denial of information—may also qualify" as sufficiently concrete. *Grae*, 57 F.4th at 569. And this Court has explained that *TransUnion*'s "adverse-effects rule" applies as "part of the constitutional inquiry" across all cases. *Id.* at 571. So the rule applies here.

Per *Grae*, "other courts have not found it difficult to define 'adverse effects.'" *Id.* Our caselaw requires that the denied information have "some relevance" to the plaintiff. *Brintley v. Aeroquip Credit Union*, 936 F.3d 489, 493 (6th Cir. 2019). The plaintiff must have some personal "interest in using the information." *Grae*, 57 F.4th at 571 (cleaned up) (quoting *Harty v. W. Point Realty*, 28 F.4th 435, 444 (2d Cir. 2022)). The denied information must specifically relate to some negative outcome that the plaintiff suffered because he was unable to use that information to his benefit. So, to show standing at summary judgment, Merck must point to specific evidence tending to prove that he has an interest in using the withheld information—the fact that he wasn't hired because he failed to disclose his conviction—for some purpose beyond his statutory right to receive it. *See id.* In other words, his interest in using the withheld information must extend beyond simply suing to vindicate that interest. *See id.*; *Harty*, 28 F.4th at 444; *TransUnion*, 594 U.S. at 440–42 (explaining that the plaintiffs must show that the information deficit caused some discrete harm to an interest beyond the "bare" procedural interest in receiving the correct information).

*TransUnion* provides some guideposts for what it means to suffer adverse effects from an asserted informational injury. *See TransUnion*, 594 U.S. at 440–42. The Court offered certain evidence that, in its view, showed that the plaintiffs had failed to prove such effects: none of the

relevant plaintiffs opened the mailings, established that they were confused by the information they received, or showed that they relied on the information. *Id.* at 440. The plaintiffs did not show they attempted to correct the information in their credit files. *Id.* They "made no effort" to explain how the erroneously formatted information prevented them from reaching out to the credit reporting agency to correct the credit information. *Id.* at 441. They failed to argue they never received required information—just that the information they received was incorrectly formatted. *Id.* And finally, they failed to allege any downstream consequences of the incorrectly formatted information—for instance, that the reporting agency's statutory violation prevented them from correcting erroneous information before it could be sent to third parties. *Id.* at 442.

Arguably, Merck has made some of those hypothetical showings here. He alleges he never received required information in the report. He argues that he relied on Walmart's failure to disclose the complete background report, including the self-disclosure code: he testified that he would have asked either Walmart or the vendor what the "R3" code meant, rather than simply asking why he hadn't been hired. He relied on the report that he received—which omitted the self-disclosure code—to call to ask why he had been scored "Not Competitive." He further testified that, had he seen the code, it would have given him "something to focus on." Merck Dep., R.105-3 at PageID 2325. And he also said that, without the ability to "refer to" the code to determine the reason he wasn't hired, he was left under the mistaken assumption that Walmart had withdrawn his offer because he *had* the conviction, not because he'd failed to *disclose* the conviction. *Id.* Merck testified that he was "never given the chance to clarify" why he "did not disclose" the conviction—i.e., that it was an innocent mistake that he wasn't "trying to hide." *Id.* at PageID 2306, 2309. So he certainly made an "effort" to determine why he hadn't been hired by contacting Walmart or its background report vendor. *See TransUnion*, 594 U.S. at 441. And the information he didn't receive—the "R3" code reflecting the true basis for rejecting his job application—certainly had some "relevance" to him. *See Brintley*, 936 F.3d at 493. After all, it could have assisted him in determining the actual reason why Walmart decided not to hire him.

But Merck fails to point to any evidence that he would have been able to *use* the information about the self-disclosure code to his benefit. First, and perhaps most importantly, Walmart argues that its policy meant that it would not have reconsidered its initial decision not to

hire him based on his failure to disclose the misdemeanor. And Walmart's argument is supported by the record. *See* Bartlett Dep., R.104-3 at PageID 2084 ("If he said [that the failure to disclose the conviction] was accurate, then [the human resources representative] would let him know he could reapply."). More to the point, Merck fails to carry his burden to identify any evidence in the record suggesting otherwise. On appeal, he argues there's "uncertainty" about whether his first application could have "gone differently" had he known about the true basis for his rejection. Reply Br. 22. But that's not enough. He needed to identify specific evidence that he could have used the denied information to create some material benefit (or avoid some adverse consequence) to himself—and, given the record, he could not have used the information about the self-disclosure code to change anything about the result of his first application. *See Grae*, 57 F.4th at 571. So he fails to show he suffered any downstream consequences from Walmart withholding the "R3" code during his first application and rejection.

Similarly, Merck points to nothing in the record indicating that he would have used the withheld information to do anything differently during his second and third applications to work at Walmart. Very helpful to Merck's case would have been evidence that Walmart in some way relied on Merck's lack of an explanation to reject his later applications outright before allowing him to fill out a new criminal history addendum. Indeed, if there were some evidence to that effect, Merck likely would have a forceful argument that the withheld information materially affected the outcome of those applications. After all, in any later calls to Walmart, he could have attempted to correct that misimpression.

But during discovery, Merck apparently couldn't uncover any evidence that Walmart rejected his later applications because of his failure to disclose the misdemeanor. And the evidence that we *do* have suggests that Merck's first application had no bearing on the later ones. A Walmart employee testified that Walmart retained employment application information for only sixty days. Walmart also points to a policy indicating that the self-disclosure code was "used by" human resources "only and is not relevant to the hiring manager" at the store "or the candidate." Ex. to Bartlett Decl., R.105-1 at PageID 2154. Walmart argues that store employees would not have known what these codes meant. And Merck points to no record evidence refuting that. So it seems that even if Merck had known about the true basis of his first rejection, the

record before us suggests he couldn't have used that information to improve his chances for his second and third applications at Walmart. If his first application had no bearing on his later ones, we simply can't say why he didn't get interviewed the second and third time around. Merck's burden was to show the reason related to the withheld information. He has not met that burden.

Finally, Merck argues that he has a general interest in understanding "why his job application had gone wrong at Walmart" because he was searching for other employment at the time. Oral Arg. at 01:59–02:01. Abstractly, this interest is compelling. But again, Merck fails to point to any evidence in the record that he could have used the denied information to do anything differently. He might be in a different position if he introduced proof that he declined to apply to other positions because he worried that his misdemeanor might bar him from being hired or spent more time unemployed than he otherwise would have if he had known that the true issue was merely his failure to disclose. But he cannot point to any supporting evidence in the record. Other than a passing reference to feeling like a "failure" after his rejection from Walmart, Merck Dep., R.105-3 at PageID 2228, he identifies nothing to suggest any material harm that resulted from the denial of information. Indeed, he applied for one other job after being rejected. He disclosed to the employer that he had a misdemeanor conviction. He got the job. And he timed the start of his job so that he had no gap in employment.

Merck makes no mention of anything that he could—or would—have done differently to find employment had he known the true basis of his Walmart rejections. Logically, it seems that he did exactly what he *should* have done, had he known about the self-disclosure code—disclose the conviction to the new employer before being hired. And he *got* hired. As above, Merck fails to identify any evidence in the record that he could have used the withheld information to do anything differently during his job search. *See Grae*, 57 F.4th at 571. So he has not suffered any downstream consequences to his broader job search, either.

\* \* \*

With more specific evidence in the record, Merck might have prevailed on his informational-injury theory of standing. And, certainly, this case might have had a different outcome if Merck could rest solely on his allegations—say, at the motion-to-dismiss stage. But at

summary judgment, the plaintiff bears the burden to identify specific facts supporting each element of standing. Merck failed to point to any evidence showing that he could have used the withheld information to his benefit. He failed to identify record evidence that he could have been hired after his first application, that Walmart rejected his second and third applications because of the self-disclosure issue, that he lacked any opportunity to explain his conviction during the second and third job applications, and that his lack of information in any way affected his later job search—during which he applied for one job, disclosed the conviction, and got hired. All he manages to show is that he was denied information. He hasn't satisfied the second element of the informational-injury test: that he suffered adverse effects from the denial of that information. Given the record before us, Merck could not have used that information to act any differently than he did, under the circumstances. So, because of the standard we apply to his claims at summary judgment, Merck does not have standing to sue for an informational injury.

### 2.     Comparison to deprivation of constitutional procedural due process

Merck's next standing theory seeks to compare failing to receive a complete copy of a consumer report to the traditional constitutional harm of the denial of procedural due process. Specifically, Merck and amicus argue that Walmart's actions bear "a close relationship to the traditionally recognized harm of the denial of pre-deprivation notice and an opportunity to be heard." Appellant's Br. 39**.** But Merck fails to account for the key characteristic of a procedural-due-process claim: that the substantive interest protected in such cases exists only because of its relationship to the authority of a *public* entity.

The Supreme Court in *TransUnion* explained that the Constitution can provide certain "traditional harms" as analogues for Congress to use in creating statutory causes of action. *See* 594 U.S. at 425. Specifically, the Court pointed to two "harms specified by the Constitution itself": abridgment of free speech and infringement of free exercise. *Id.* As amicus points out, Congress has "frequently elevated" certain harms that have close relationships to constitutional harms. Amicus Br. 10. For instance, Congress has prohibited racial discrimination by private housing providers. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 529–30 (2015) (describing the scope of liability under the Fair Housing Act). Plaintiffs under the Fair Housing Act have standing under Article III because Congress identified and

elevated an individual harm—private discrimination in the housing market on the basis of race. That harm is comparable to a harm found in the Constitution—racial discrimination by the government. *See* U.S. Const. amend. XIV; *Inclusive Cmtys.*, 576 U.S. at 528–30. Congress has also protected against private religious discrimination. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770 (2015). And, under the Religious Freedom Restoration Act, Congress has expanded free-exercise protections against state actors beyond what the Constitution protects. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–96 (2014). In those cases, plaintiffs suffer a discriminatory harm—on the basis of race or religion—that closely resembles the discrimination prohibited by the Constitution, so they have Article III standing to sue in federal court.

Merck seeks to derive constitutional standing from an analogy to the right that individuals possess to adequate procedure prior to the deprivation of life, liberty, or property. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). Merck points to the text of the Fair Credit Reporting Act for his argument that the Act bears a "close relationship" to "the denial of notice and an opportunity to be heard" before being subject to adverse action. Appellant's Br. 41. In response, Walmart disputes that anything in the Act creates a consumer right to have an opportunity to respond to a pending adverse action before the employer can take that action. Walmart relies on caselaw in our sibling circuits holding that nothing in the text of the Act establishes a right to dispute an inaccurate report. *See Schumacher v. SC Data Ctr., Inc.*, 33 F.4th 504, 511–12 (8th Cir. 2022); *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1092–93 (9th Cir. 2020).

But we need not decide the exact scope of the rights a consumer enjoys under the Act. Merck's comparison fails for a more fundamental reason. *TransUnion* warns courts to look out for "essential" elements of liability that may appear in a traditional cause of action but that the modern claim lacks. 594 U.S. at 434. Here, there's a clear difference between Merck's statutory claim and a procedural-due-process claim: Walmart is not a state actor.

Now, we can't simply distinguish these analogues merely on the basis of the state-action doctrine. After all, the Court has made clear that Congress has the power to elevate certain harms—caused by private actors—that bear strong resemblances to constitutional claims. *See id.*

at 425. If the state-action doctrine served as a bar to Congress providing statutory causes of action to claims that resemble constitutional harms, then Congress would be unable to protect against, for example, private racial or religious discrimination. And it can clearly do those things. *See, e.g.*, *id.*; *Inclusive Cmtys.*, 576 U.S. at 528–30; *Abercrombie & Fitch*, 575 U.S. at 770.

But the protected property and liberty interests under a due-process claim are different. The essential nature of a property or liberty interest depends on the existence of the government. "Property interests, of course, are not created by the Constitution." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). But "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* The state has unique power to confer a "legitimate claim of entitlement" to a liberty or property interest. *Id.*; *see also Golden v. City of Columbus*, 404 F.3d 950, 955 (6th Cir. 2005) (noting that the Supreme Court "has identified two bases" for "non-unilateral legitimate claims of entitlement: state statutes and contracts" between a citizen and a state or its agencies). That's why procedural protections against the *deprivation* of those interests by the state—without due process—are so important. "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Roth*, 408 U.S. at 577. "It is a purpose of the constitutional right" to due process "to provide an opportunity for a person to vindicate those claims." *Id.*

Indeed, property "is the creation of law." Charles A. Reich, *The New Property*, 73 Yale L.J. 733, 739 (1964). And before due-process precedent enshrined protections for individuals against the arbitrary deprivation of certain intangible property interests by state actors, the government could typically "withhold, grant, or revoke" its "largess"—or its wealth and benefits—"at its pleasure." *Id.* at 740; *see also Lynch v. United States*, 292 U.S. 571, 577 (1934), *abrogated by Goldberg v. Kelly*, 397 U.S. 254, 261–63 (1970). Today, individuals enjoy protections against such deprivations precisely because those interests are conferred by the government. *See Goldberg*, 397 U.S. at 262–63. Indeed, the very nature of sovereign government in this country distinguishes between the authority of a "private person," who is merely "directly responsible for his acts," and a public entity, "who acts pursuant to the command of a legal

precept." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 283 (1855).

A private employer—even in a contract with one of its employees—cannot alone create the kind of "legitimate claim of entitlement" to a property interest that the state has the power to confer. *See Roth*, 408 U.S. at 577. Each party enjoys certain contractual rights with respect to the other, to be sure. And, of course, the parties are obligated to respect any other duties they have under other private-law doctrines. But a property or liberty interest owes its existence to the regime of state laws or rules that define the dimensions of that interest. *See id.*; *Goss v. Lopez*, 419 U.S. 565, 572–73 (1975). The state's endorsement of the validity of a particular interest generates, in essence, an imprimatur of legitimacy that gives the holder of that interest certain rights against the rest of the world. Those rights are strong; that's why it's important to ensure the government provides due process before depriving someone of those rights. *See Goldberg*, 397 U.S. at 261–63. Private actors cannot generate that same legitimacy.

The essential nature of the core interest at the heart of a procedural-due-process claim underscores why Merck's theory does not succeed in the private context. Of course, much of the analogy that Merck presses does compare almost directly to the rules that govern in the due-process context. The Fair Credit Reporting Act requires, at a minimum, that an employer taking an adverse action against a prospective employee provide that person certain information about why they're taking the adverse action—before the action is taken. 15 U.S.C. § 1681b(b)(3)(A). That certainly feels like due process. For public employment, a similar right exists: any employee "who has a constitutionally protected property interest in his employment" must receive "some kind of hearing" prior to being fired. *Loudermill*, 470 U.S. at 542 (quotation omitted). In general, any deprivation of "life, liberty, or property" must "'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.'" *Id.* (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). The Act contains such a pre-adverse action notice requirement.

But any interest an employee has in continued employment for a private actor differs in kind from the property interest that results from public employment. The state has unique authority to create certain property interests. Private employers do not have that same authority.

So courts hold the state to a higher standard when it seeks to deprive someone of those interests; but, correspondingly, we do *not* hold private actors to that standard. The nature of the interest in a property right endorsed by the state is different in kind than the nature of a contractual right possessed by one private party against another. And Merck has shown only that he has an individual interest in private employment with Walmart, not that he possesses an interest that *any* member of the citizenry would possess with respect to *any* publicly conferred property or liberty interest. Indeed, the limited protections available under the law to at-will employees—as Merck applied to be here—underscore that any interest Merck possesses cannot compare to the strength of a property interest grounded in state law. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 606 (2008) ("The basic principle of at-will employment is that an employee may be terminated for a good reason, bad reason, or no reason at all." (quotation omitted)).

Merck cannot show that the interest protected by the Fair Credit Reporting Act is sufficiently analogous to the constitutional property interests protected by the Due Process Clause. *See TransUnion*, 594 U.S. at 433. So he has failed to establish that he suffered a concrete injury in fact under the theory that his suit is analogous to the denial of a right to procedural due process.

**3.      Comparison to harms from traditional tort and contract claims**

Merck's final theory of injury also rests on the *Spokeo* and *TransUnion* test identifying certain traditional harms under the constitutional standing doctrine. "Chief among" the various intangible harms are "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. In addition to relying on traditional harms specified in the Constitution, Merck also proposes several traditional common-law actions as comparisons. He argues these common-law claims "all rest upon the same principle: That it is harmful to be denied material information in the course of a business transaction or similar circumstances." Appellant's Br. 46.

To determine whether a statutory claim bears a close relationship to a traditional harm, we "analogize" to common-law causes of action. *Dickson v. Direct Energy, LP*, 69 F.4th 338, 344 (6th Cir. 2023) (quoting *Gadelhak*, 950 F.3d at 462). Broadly, it's helpful to compare the

elements of the statutory violation and the common-law claim, though *TransUnion* cautions against requiring too close a match before finding that a plaintiff possesses standing. 594 U.S. at 433 ("[W]e do not require an exact duplicate."). Indeed, we look for a close relationship "in kind, not degree." *Dickson*, 69 F.4th at 344 (quoting *Gadelhak*, 950 F.3d at 462). That means that we should limit our focus on the *magnitude* of any imposition and turn instead to the fundamental resemblances—or differences—between the asserted statutory and common-law claims. *See Gadelhak*, 950 F.3d at 462–63. As an illustrative example, consider then-Judge Barrett's approach in *Gadelhak*. She found that the sending of unwanted text messages (in violation of the Telephone Consumer Protection Act) was sufficiently analogous to the common-law tort claim of intrusion upon seclusion. Common law might not permit recovery for the unwanted receipt of, say, five text messages, because the traditional tort claim generally requires a "much more substantial imposition." *Id.* at 462. But by focusing on the *kind* of harm, rather than the magnitude, she found it clear that Congress could elevate that harm—receipt of a small number of text messages—to a concrete injury in fact. *Id.* at 463.

*Spokeo* identified a few concrete common-law harms for which recovery is available "even if their harms may be difficult to prove or measure": for instance, libel and slander. *See* 578 U.S. at 341–42 (citing Restatement (First) of Torts §§ 569, 570). *TransUnion* identified a few more examples: reputational harms, disclosure of private information, and intrusion upon seclusion. *See* 594 U.S. at 425 (first citing *Meese v. Keene*, 481 U.S. 465, 473 (1987) (reputational harms); then *Davis v. FEC*, 554 U.S. 724, 733 (2008) (disclosure of private information); and then *Gadelhak*, 950 F.3d at 462 (intrusion upon seclusion)). Comparing historical claims—specifically, defamation—to the modern analogue in *TransUnion* meant that some plaintiffs whose misleading information had been disclosed to a third party had standing under the Fair Credit Reporting Act to sue the credit agency for failing to follow reasonable procedures to maintain accurate credit files. *Id.* at 431–33. Those plaintiffs did not need to show an exact, element-by-element match to the common-law claim—after all, the *TransUnion* defendant did not maintain *false* information about the group of plaintiffs, merely *misleading* information. *Id.* at 433. In the Court's view, that harm was close in kind to the traditional harm of a defamatory statement, meaning those plaintiffs had standing under the Act. *Id.*

The next group of plaintiffs, though, did not have standing. Those plaintiffs failed to show an "essential" element of liability for defamation: publication. *Id.* at 434 (quoting Restatement (First) of Torts § 577, cmt. a). In the Court's eyes, "there is 'no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury.'" *Id.* (quoting *Owner-Operator Ind. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339, 344–45 (D.C. Cir. 2018)). So the Court drew a line in the sand: an "'exact duplicate' of a traditionally recognized harm is not required," but "the new allegations cannot be missing an element 'essential to liability' under the comparator tort." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1242 (11th Cir. 2022) (en banc) (quoting *TransUnion*, 594 U.S. at 433–34). On one side of the line falls the set of plaintiffs subject to the publication of misleading—but not literally false—information. *TransUnion*, 594 U.S. at 433. They have suffered a concrete injury in fact. On the other side lie plaintiffs with the exact same misleading information in their credit report—but who never suffered any harm from the *dissemination* of that information. *Id.* at 434.

That dividing line helps frame the analysis in Merck's case. He points to several common-law tort and contractual claims as asserted analogues for his procedural claim under the Fair Credit Reporting Act. They include: nondisclosure and fraudulent misrepresentation, *see* Restatement (Second) of Torts §§ 529, 538, 551(1); invasion of privacy, *see* Restatement (Second) of Torts § 652A; *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 324 (3d Cir. 2018); and contractual misrepresentation, *see* Restatement (Second) of Contracts § 164. Merck argues that this web of common-law claims generates a general principle that "it is harmful to be denied material information in the course of a business transaction or similar circumstances." Appellant's Br. 46.

Merck's theoretical principle overstates the simplicity of the common-law analogues on which he relies. Framed so generally, his theory might indeed be a strong match for the statutory scheme that establishes the duties employers have under the Fair Credit Reporting Act. The provisions at issue here are fairly simple: "before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates" (1) "a copy of the report;" and (2) a "description" of the consumer's

"rights" under the Act. 15 U.S.C. § 1681b(b)(3)(A). And, arguably, such information—the report and a description of a consumer's rights—might *always* be material in the context of an adverse employment action.

But a closer look at the common-law claims underscores why the statutory scheme is different in kind than the traditional harms Merck identifies. An essential element of intrusion upon seclusion, one of his proposed comparisons, is that the intrusion be unwanted. Consent eliminates that element entirely. *See, e.g.*, *Lunsford v. Sterilite of Ohio, L.L.C.*, 165 N.E.3d 245, 254 (Ohio 2020); Restatement (Second) of Torts § 652B (establishing liability for an intrusion only if the intrusion is "highly offensive to a reasonable person"). Use of personal information—like a name or likeness—has a similar requirement. *See Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 574–75 (1977) (explaining that "right of publicity" includes actions against media organizations for publication of an act without consent). Merck's proposed comparison fails to account for that essential element. The key difference here is that he *consented* to Walmart's use of his private information in performing its background check. And the statutory scheme indicates nowhere that it covers only scenarios where the plaintiff has not consented to the use of his consumer information. *See* 15 U.S.C. § 1681b(b)(3)(A). Merck didn't seek to *avoid* receipt of information from Walmart—he *wanted* to receive accurate information. So these first two privacy torts don't qualify.

The other two fare no better. Unreasonable publicity of someone's private life, *see* Restatement (Second) of Torts § 652D, and false light liability, *see* Restatement of Torts § 652E, both have a publication requirement. Like in *TransUnion*, that dooms Merck's claim. Even assuming the information that he didn't receive can be characterized as private—given his consent to conduct the background check—or misleading enough to qualify as "false light," Merck cannot show that anyone beyond Walmart, acting through the vendor, received the information. And the relevant provision of the Act concerns only the disclosure of information to the *consumer* who is the subject of the report, not anyone else. So like in *TransUnion*, the lack of a publication means that the harm from these torts does not qualify as close enough in kind to generate Article III standing. *See TransUnion*, 594 U.S. at 434.

Somewhat more complicated are Merck's analogies to various misrepresentation and nondisclosure tort and contract claims. The district court determined that the harm from these common-law claims did not compare to the harm from failure to disclose information under the Fair Credit Reporting Act because "Merck has not shown that Walmart owed" Merck "a duty to exercise reasonable care in making disclosures" to the consumer. Order, R.114 at PageID 2603. The district court is correct that the common-law claims do typically require a showing that the defendant owes the plaintiff some contractual or tort-based duty of reasonable care. *See, e.g.*, Restatement (Second) of Torts § 551(2). But as Merck argues on appeal, it's not clear that this can be the sole basis for Walmart to avoid liability, as the Act *does* impose a duty on Walmart to provide the consumer with full and accurate information contained in a consumer report being used for an adverse employment action. *See* 15 U.S.C. § 1681b(b)(3)(A)(i). Arguably, that duty is different only in degree from the traditional duty under tort and contract liability to exercise reasonable care in disclosing material information to another. So it might qualify under *TransUnion*.

But Merck's argument misses the forest for the trees. Each of the nondisclosure common-law analogues he identifies serves to advance the interests that a party and a counterparty to a "business transaction" or a contract have against each other. *See* Restatement (Second) of Torts §§ 529 cmts. a, b, c, illus., 551; Restatement (Second) of Contracts § 164. In essence, these claims are concerned with reliance and materiality, *see* Restatement (Second) of Torts § 538, because one party might induce the other to agree to something—i.e., to enter into the contract or business transaction—on the basis of false or misleading information. But the Act here imposes an *absolute* duty on an employer to disclose information used in an adverse employment decision. 15 U.S.C. § 1681b(b)(3)(A)(i). The duty exists independently of whether Merck might rely on the information to enter into a transaction or contract. In that sense, the common-law analogues are narrower than the comparable provisions under the Act. The Act provides for potential liability regardless of whether one party intends to induce the other "to act or to refrain from action in reliance" upon the misrepresentation of fact. Restatement (Second) of Torts § 525; *see also* Restatement (Second) of Contracts § 164 (requiring that a misrepresentation induce a "manifestation of assent" to enter a contract).

Merck argues that he might have justifiably relied on the failure to provide the true reason why his job offer was revoked because he "refrain[ed] from trying to explain that he had failed to report the misdemeanor conviction because he had forgotten it." Appellant's Br. 45. But he fails to recognize that the element "essential to" Walmart's "liability," *TransUnion*, 594 U.S. at 434, is that he in some way manifested his assent or sought some benefit from a transaction that he was entering. *See* Restatement (Second) of Contracts § 164; Restatement (Second) of Torts § 525. There was no such transaction here. Walmart did not provide information—be it true or misleading—because it sought to take advantage of a position of trust it possessed over Merck or because it wanted to induce his agreement to a contractual exchange between the two parties. It provided the information pursuant to a wholly one-sided statutory duty that exists independently of whether the employer and the employee transact in any way with each other. *See* 15 U.S.C. § 1681b(b)(3)(A). Indeed, under the plain text of the Act, that's the *only* duty Walmart possesses. It has no statutory duty to correct false or misleading information. And it has no duty to refrain from taking an adverse action if the consumer seeks to correct false or misleading information. All of this makes sense, because the provision isn't concerned with regulating contractual or business exchanges between parties. It's instead concerned with providing consumers tools to ensure that *other* entities don't rely on false and unfairly aggregated information about the consumers. *See id.* § 1681(a).

Because Walmart's duties under the Act extend outside those elements essential for liability under traditional tort and contractual nondisclosure claims, Merck has failed to show he has standing under his traditional-harm theory. Indeed, the final two words of Merck's proposed harm principle give away the game: he says it's harmful to be denied material information in a business transaction or "similar circumstances." Appellant's Br. 46. But the *existence* of a transaction—one in which one party seeks to gain some benefit from another party based on false or misleading information—is necessary to that party's liability. Merck had no rights or obligations under the theoretical "transaction" meant to provide an analogue for the statutory framework here. So it's clear that Walmart never entered any transaction or agreement by disclosing—or failing to disclose—information under the Fair Credit Reporting Act. This theory of standing fails.

**C.**

Because we affirm the district court's finding that Merck does not have constitutional standing to sue, we decline to address Walmart's three alternative arguments in support of summary judgment.

**IV.**

We **AFFIRM** the district court's grant of summary judgment in Walmart's favor.